# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
### No. 22-1061V

| | |
|---|---|
| NICOLE JACKSON,<br><br>　　　　　　Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>　　　　　　Respondent. | Chief Special Master Corcoran<br><br>Filed: December 16, 2025 |

*Maximillian J. Muller*, Muller Brazil, LLP, Dresher, PA, for Petitioner.

*Felicia Langel*, U.S. Department of Justice, Washington, DC, for Respondent.

### RULING ON ENTITLEMENT AND DECISION AWARDING DAMAGES[1]

On August 23, 2022, Nicole Jackson filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she suffered a shoulder injury related to vaccine administration ("SIRVA") as a result of a tetanus-diphtheria-acellular pertussis ("Tdap") vaccine received on February 1, 2021. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters (the "SPU").

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

The parties were unable to settle the claim, and have now fully briefed entitlement and damages (ECF Nos. 29, 30, 31). For the reasons set forth herein, I find that Petitioner is entitled to compensation, and I award damages for actual pain and suffering in the amount of $55,000.00, plus reimbursement of a Medicaid lien in the amount of $2,017.67.

## I.   Factual Evidence
### A.  Medical Records

On February 1, 2021, Petitioner received a Tdap vaccine in her right deltoid. Ex. 1 at 2. The vaccine was administered during a medical visit for a urinary tract infection ("UTI") and other health concerns. Ex. 8 at 5.

Five months later (July 8, 2021), Petitioner saw Dr. Tania Sadik for right shoulder pain. Ex. 3 at 5. She explained that she had received a Tdap vaccine in February, and her arm "became extremely painful immediately afterwards" and remained painful. *Id.* She could not raise her arm greater than 60 degrees, and also had difficulty with internal and external rotation. *Id.* On examination, she had pain with internal and external rotation. *Id.* at 6. Petitioner was assessed with acute right shoulder pain, likely subdeltoid bursitis, and referred for physical therapy ("PT"). *Id.*

Petitioner underwent a PT evaluation for her right shoulder two weeks later, on July 22, 2021. Ex. 4 at 180. She complained of "R shoulder pain since February 2021 after receiving a Tdap shot in her R shoulder." *Id.* She had "poor tolerance to all motion" involving her right arm, with "significant fear avoidance behaviors." *Id.* She explained that the day after vaccination, her arm "swelled up and felt painful." *Id.* at 182. Her movements were "very guarded" and she was observed to grimace in pain in anticipation of right arm movement. *Id.* at 180. She rated her pain five out of ten. *Id.* at 183. Petitioner was the primary caretaker for a minor child with a disability, and reported difficulty with routine daily activities. *Id.* at 182.

On examination, Petitioner's right shoulder active range of motion ("ROM") was 90 degrees in flexion (compared to 150 degrees on the left side), 50 degrees in extension (versus 65 degrees on the left side), and 85 degrees in abduction (versus 160 on the left side). Ex. 4 at 191. The therapist observed that "surprisingly the shoulder joint does not appear frozen or restricted" and that her ROM was difficult to fully assess due to pain and "may be self limited." *Id.* at 180.

Petitioner returned to Dr. Sadik on August 23, 2021. Ex. 5 at 35. She had been doing PT with minimal improvement, and continued to have pain when raising her arm or lying on that side. *Id.* On examination, her right shoulder exhibited full ROM, with some pain when raising her shoulder greater than 60 degrees, *Id.* Petitioner was given a cortisone injection and advised to continue PT. *Id.* at 36.

Petitioner attended a total of ten PT sessions between July 22 and September 2, 2021. Ex. 4 at 93-180. After her September 2nd session, she self-discharged, explaining that she would return to her doctor for imaging. *Id*. at 93, 94. Throughout this time, her pain level generally fluctuated between four and six out of ten, although by the last session it had improved to three. *Id*. at 93-180.

Petitioner returned to Dr. Sadik on September 9, 2021, reporting that she had "some improvement" after the cortisone injection, but continued to have pain. Ex. 5 at 30. Her physical therapist recommended two additional weeks of therapy, but Petitioner had not been improving the last couple of weeks and wanted to determine what was wrong with her arm. *Id*. On examination, her right shoulder ROM was diminished both actively and passively. *Id*. at 31. Dr. Sadik now suspected adhesive capsulitis and ordered an MRI. *Id*.

Petitioner returned to Dr. Sadik the following month (October 4, 2021) to review the MRI, which showed adhesive capsulitis, a mild partial tear of a rotator cuff tendon, and osteoarthritis. Ex. 5 at 25. Petitioner was referred for more PT and an orthopedic consult. *Id*. at 26.

Petitioner underwent a second PT evaluation on November 11, 2021. Ex. 4 at 69. She rated her pain four out of ten. *Id*. at 71. On examination, her right shoulder active ROM was 122 degrees in flexion (compared to 180 degrees on the left), 90 degrees in abduction (versus 180 degrees on the left), 45 degrees in internal rotation (versus 90 degrees on the left), and 30 degrees in external rotation (versus 90 degrees on the left). *Id*. at 81.

Petitioner returned to Dr. Sadik's office on March 15, 2022, reporting significant improvement with PT. Ex. 5 at 13. She was given another cortisone injection.[3] *Id*. at 15.

Petitioner attended a total of ten PT sessions between November 11, 2021 and March 31, 2022. Ex. 4 at 13-69; Ex. 10 at 12-14. She was discharged on March 31, 2022 because her insurance would not cover additional sessions. Ex. 10 at 13. At discharge, she reported subjective improvements in her ability to use her right arm for usual daily activities, but the therapist noted that this improvement was not reflected in her scores on a functional evaluation, and that her ROM measurements had *worsened*, although her pain level had improved. *Id*.

Petitioner saw Dr. Sadik for a wellness exam on July 5, 2022. Ex. 10 at 16. She reported that her "[s]houlder is better at this time." *Id*. On examination, she had full range of motion without pain. *Id*. at 18.

---

[3] The record of this visit states that she had received "at least 4 joint injections, which she gets every 3 months for recurrent right shoulder pain." Ex. 5 at 13. However, the parties agree that Petitioner received a total of two cortisone injections. ECF No. 29 at 13; ECF No. 30 at 8.

### B. Other Evidence

Petitioner submitted a declaration in support of her claim. Ex. 7. She explains in it that the morning after vaccination, her right shoulder "was in tremendous pain and it was swollen and stiff." *Id*. at ¶ 3. She could not lay on her right shoulder, and could not sleep due to pain. *Id*. Initially, she treated with over-the-counter ibuprofen and cold compresses, without improvement. *Id*. at ¶ 4. She then called the facility where she had received the vaccine, and was told that pain could be a side effect of vaccination, and to return if it did not improve. *Id*. at ¶ 5.

Petitioner continued self-treating with ibuprofen and cold compresses "as long as I could." Ex. 7 at ¶ 6. She avoided going to the doctor because she has a minor child with health issues and a disability, and wanted to avoid COVID exposure. *Id*. Therefore, she suffered until she "felt [she] really had to see the doctor." *Id*. She called a doctor recommended by a neighbor in June, but was unable to be seen until July. *Id*. at ¶ 7. In the interim, the swelling reduced but she continued to have difficulties with routine daily activities such as combing her hair and getting dressed. *Id*.at ¶ 8.

Petitioner submitted a social media post (along with a supplemental declaration identifying the post and account as hers) dated May 28, 2021. Exs. 11, 12. In the post, Petitioner states that her "arm still hurts from the tetanus shot I got back in February." Ex. 12.

## II. Factual Findings and Ruling on Entitlement

### A. Legal Standards

Before compensation can be awarded under the Vaccine Act, a petitioner must preponderantly demonstrate all matters required under Section 11(c)(1), including the factual circumstances surrounding his or her claim. Section 13(a)(1)(A). In making this determination, the special master or court should consider the record as a whole. Section 13(a)(1). Petitioner's allegations must be supported by medical records or by medical opinion. *Id.*

To resolve factual issues, the special master must weigh the evidence presented, which may include contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Human Servs.,* 3 F.3d 415, 417 (Fed. Cir. 1993) (explaining that a special master must decide what weight to give evidence including oral testimony and contemporaneous medical records). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

To overcome the presumptive accuracy of medical records testimony, a petitioner may present testimony which is "consistent, clear, cogent, and compelling." *Sanchez v. Sec'y of Health & Human Servs.,* No. 11–685V, 2013 WL 1880825, at *3 (Fed. Cl. Spec. Mstr. Apr. 10, 2013) (citing *Blutstein v. Sec'y of Health & Human Servs.,* No. 90–2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)). The Federal Circuit has "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Human Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021) (explaining that a patient may not report every ailment, or a physician may enter information incorrectly or not record everything he or she observes).

In addition to requirements concerning the vaccination received and the lack of other award or settlement,[4] a petitioner must establish that he or she suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination he or she received. Section 11(c)(1)(C). The Vaccine Act further includes a "severity requirement," pursuant to which a petitioner demonstrate that they "suffered the residual effects or complications of such illness, disability, injury, or condition for more than 6 months after the administration of the vaccine . . . ." Section 11(c)(1)(D).

"[T]he fact that a Petitioner has been discharged from medical care does not necessarily indicate that there are no remaining or residual effects from her alleged injury." *Morine v. Sec'y of Health & Human Servs.*, No. 17-1013, 2019 WL 978825, at *4 (Fed. Cl. Spec. Mstr. Jan. 23, 2019); *see also Herren v. Sec'y of Health & Human Servs.*, No. 13-1000V, 2014 WL 3889070, at *3 (Fed. Cl. Spec. Mstr. July 18, 2014) ("a discharge from medical care does not necessarily indicate there are no residual effects"). "A treatment gap . . . does not automatically mean severity cannot be established." *Law v. Sec'y of Health & Human Servs.*, No. 21-0699V, 2023 WL 2641502, at *5 (Fed. Cl. Spec. Mstr. Feb. 23, 2023) (finding severity requirement met where Petitioner sought care for under three months and had met physical therapy goals but still lacked full range of motion and experienced difficulty with certain activities, then returned to care nearly five months later reporting stiffness and continuing restrictions in motion); *see also Peeples v. Sec'y of Health & Human Servs.*, No. 20-0634V, 2022 WL 2387749 (Fed. Cl. Spec. Mstr. May 26, 2022) (finding severity requirement met where Petitioner sought care for four months, followed by fifteen-month gap); *Silvestri v. Sec'y of Health & Human Servs.*, No. 19-1045V, 2021 WL 4205313 (Fed. Cl. Spec. Mstr. Aug. 16, 2021) (finding severity

---

[4] In summary, a petitioner must establish that he received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception and has not filed a civil suit or collected an award or settlement for his or her injury. Section 11(c)(1)(A)(B)(E).

5

requirement satisfied where Petitioner did not seek additional treatment after the five month mark).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of a flu vaccine. 42 C.F. R. § 100.3(a)(XIV)(B). The criteria establishing a SIRVA under the accompanying Qualifications and Aids to Interpretation ("QAI") are as follows:

> Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:
>
> (i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;
>
> (ii) Pain occurs within the specified time-frame;
>
> (iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and
>
> (iv) No other condition or abnormality is present that would explain the patient's symptoms (*e.g.* NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may

be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id*.

### B. Parties' Arguments on Entitlement

Petitioner asserts that treatment delays alone do not undermine a finding that a claimant's pain began within 48 hours. Petitioner's Motion, filed May 20, 2024, at *7 (ECF No. 29) ("Mot."). Petitioner initially attempted to self-treat in an attempt to avoid COVID exposure to protect her minor child. *Id*. at *9. When she did seek treatment, she consistently described pain that began within 48 hours of vaccination. *Id*. at *8. And she did not have any other medical appointments in the time between vaccination and her first care for shoulder pain. *Id*. at *9 n. 1.

Respondent argues that the record does not preponderantly support a finding that Petitioner's pain began within 48 hours, emphasizing that she first reported arm pain in a late May 2021 social media post, nearly four months after vaccination. Respondent's Response, filed July 30, 2024, at *5 (ECF No. 30) ("Resp."). And her first treatment was not until over five months after vaccination. *Id*.

Although Petitioner asserts she delayed seeking care due to fear of COVID exposure, Petitioner received the Tdap vaccine when she sought care for another concern – a UTI. Resp. at *5. Respondent thus argues that "[i]f petitioner was willing to risk exposure to COVID-19 for treatment of a painful urinary condition, it is reasonable to expect that she would have taken a similar risk for treatment of her allegedly painful right shoulder." *Id*. Alternatively, Petitioner could have called or messaged her primary care provider, or requested a telehealth appointment. *Id*. That she did not report pain or seek care for months "is strong evidence that her pain did not begin within forty-eight hours of vaccination." *Id*.

Petitioner does not dispute that she delayed seeking care, but asserts that when she did, and thereafter, she consistently reported pain immediately after vaccination. Petitioner's Reply, filed Aug. 12, 2024, at *1 (ECF No. 31) ("Reply"). *Id*. She asserts that her earlier decision to seek treatment for a UTI is not relevant to the onset of her shoulder pain. *Id*.

### C. Factual Findings on Onset

The evidence supports a finding that Petitioner's shoulder pain likely began within 48 hours of vaccination. Although she delayed seeking care for five months, when she did seek treatment she consistently related her pain to vaccination. At her first appointment, she stated that her arm became extremely painful immediately after vaccination. Ex. 3 at 5. At her first PT evaluation, she complained of pain since vaccination as well as swelling the next day. Ex. 4 at 180, 182. And Petitioner has credibly explained that she tried to avoid seeing a doctor to protect her minor child, and there is no evidence

7

that she sought treatment for other problems during the time between vaccination and her first appointment for her shoulder pain.

I am not persuaded by Respondent's suggestion that Petitioner's decision to seek treatment (and thus risk COVID exposure) for a UTI casts doubt on whether she was in fact experiencing shoulder pain in the months between vaccination and her first treatment. The decision whether, and when, to seek medical care for a condition depends on the particular facts and circumstances. I find it reasonable that a person could determine that one painful condition (particularly one involving a likely infection that could result in greater problems if left untreated) could not wait, while deciding to defer care for a different painful condition that might resolve with time.

### D. Factual Findings on Remaining SIRVA QAI Criteria and Remaining Statutory Requirements

The remaining QAI and statutory requirements are not disputed, and I find that they are satisfied. The record does not contain preponderant evidence that Petitioner had a history of left shoulder pain or any other condition that would explain her post-vaccination symptoms. Ex. 8 at 3-7; Ex. 2. She exhibited reduced ROM, and her pain and ROM limitations were limited to the vaccinated shoulder. Ex. 3 at 5-35; Ex. 4 at 93-180. She received a covered vaccine in the United States. Ex. 1 at 2. She experienced residual effects of her injury for more than six months. Ex. 5 at 35. And she states that she never received an award or settlement for her vaccine-related injury, nor has she filed a civil action. Ex. 7 at ¶ 13.

Petitioner has established by a preponderance of the evidence that all Table SIRVA and QAI requirements are established. Further, she has established all statutory requirements for entitlement. Thus, Petitioner is entitled to compensation.

## III. Damages

### A. Legal Standard

In another recent decision, I discussed at length the legal standard to be considered in determining damages and prior SIRVA compensation within SPU. I fully adopt and hereby incorporate my prior discussion in Section II of *Matthews v. Sec'y of Health & Human Servs.*, No. 22-1396V, 2025 WL 2606607 (Fed. Cl. Spec. Mstr. Aug. 13, 2025).

In sum, compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000.00." Section 15(a)(4). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996). Factors to be considered when determining an award for pain and

suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering.[5]

### B. Parties' Damages Arguments

Petitioner seeks a pain and suffering award of $70,000.00. Mot. at *1. In support of her proposed award, she cites *Hamilton*, *Celuch*, and *Welch*, involving awards of $60,000.00, $70,000.00, and $55,000.00, respectively.[6] *Id*. at *11-12. Respondent proposes a pain and suffering award of no more than $30,000.00. Resp. at *8. Respondent relies on *Ramos* and *Templin*,[7] both involving pain and suffering awards of $40,000.00.[8] *Id*. at *6.

Petitioner asserts that her injury and course of treatment are "objectively more severe" than the *Welch* petitioner, who presented with mild pain and attended six PT sessions, and that she should receive damages similar to *Celuch*. Mot. at *12-13. Although Petitioner initially delayed seeking treatment (as did the *Welch* petitioner), when she did seek care she complained of an "extremely painful" shoulder injury. *Id*. Petitioner considers her MRI findings significant, and asserts she had greater ROM limitations than the *Celuch* petitioner. *Id*. Overall, she attended 20 PT sessions and received two cortisone injections, and was discharged from PT 14 months after vaccination due to lack of insurance coverage. *Id*. at *13.

Respondent asserts that Petitioner's shoulder injury was mild, with conservative treatment of 20 PT sessions and two cortisone injections over a 14-month period. Resp. at *8. That Petitioner delayed seeking care for over five months indicates that her pain was "at the very least, tolerable," and Respondent views the MRI findings as mild. *Id*. at *8-9. Respondent argues that *Ramos* and *Templin* are two cases involving mild SIRVAs that are very similar to Petitioner's, although in his view a comparable award is not appropriate given that Petitioner had not (at the time of briefing) established onset within

---

[5] *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) (quoting *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

[6] *Hamilton v. Sec'y of Health & Human Servs.*, No. 21-0346V, 2023 WL 4635923 (Fed. Cl. Spec. Mstr. June 14, 2023); *Celuch v. Sec'y of Health & Human Servs.*, No. 18-0544V, 2021 WL 2368137(Fed. Cl. Spec. Mstr. May 10, 2021); *Welch v. Sec'y of Health & Human Servs.*, No. 18-0660V, 2021 WL 4612654 (Fed. Cl. Spec. Mstr. Sept. 2, 2021).

[7] Both parties cite facts concerning *Templin* that are not contained in the Decision in that case, which are therefore not useful in analyzing this case,

[8] *Ramos v. Sec'y of Health & Human Servs.*, No. 18-1005V, 2021 WL 688576 (Fed. Cl. Spec. Mstr. Jan. 4, 2021); *Templin v. Sec'y of Health & Human Servs.*, No. 21-1446V, 2024 WL 1675852 (Fed. Cl. Spec. Mstr. Mar. 18, 2024).

48 hours or, "at the very least, the evidence demonstrates that petitioner's pain was tolerable for five months." *Id*. at *12.

Petitioner replies that *Ramos* and *Templin* are not comparable to her case. Reply at *3. Petitioner views *Ramos* as "one of the mildest cases in the program," with the claimant's only treatment consisting of 11 PT sessions, and a pain rating of zero within three months of his initial visit. *Id*. Petitioner emphasizes that she reported severe pain and reduced ROM at her initial visits and had significant findings on her MRI. *Id*.

### C. Appropriate Compensation for Pain and Suffering

Having reviewed the record and briefing, I find that Petitioner's injury is most similar to *Welch* and *Ramos*. Ms. Jackson had an injury of similar duration to the petitioners in those cases, and all of them delayed seeking treatment. Petitioner's treatment delay is notably longer than *any* of the cited cases. Ms. Jackson and the *Ramos* petitioner had similar ROM restrictions. All treated conservatively, although Ms. Jackson underwent more treatment than the *Welch* or *Ramos* petitioners, who had less PT and did not receive any cortisone injections. In light of the record evidence, including Petitioner's initial treatment delay, I find that an award of **$55,000.00** for pain and suffering is appropriate.

### Conclusion

For all of the reasons discussed above and based on consideration of the record as a whole, **I GRANT Petitioner's motion for a ruling on the record, and find that Petitioner suffered an injury that meets the definition for a Table SIRVA and is entitled to compensation. I find that $55,000.00 represents a fair and appropriate amount of compensation for Petitioner's actual pain and suffering**. Additionally, I find that Petitioner is entitled to **$2,017.67 for reimbursement of a Medicaid lien.**

**Therefore, I award Petitioner the following:**

- **A lump sum payment of $55,000.00 for pain and suffering,[9] to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement to Petitioner; and**

---

[9] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Human Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Human Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

- **A lump sum payment of $2,017.67,[10] representing compensation for satisfaction of a Medicaid lien, to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement to:**

    **Optum
    ATTN: Amanda Bates, Recovery Specialist
    Federal Tax Identification Number 41-1858498
    Optum Event Number: 93585178
    P.O. Box 182643
    Columbus, OH 43218**

These amounts represent compensation for all damages that would be available under Section 15(a). The Clerk of Court is directed to enter judgment in accordance with this Decision.[11]

**IT IS SO ORDERED.**

<u>s/Brian H. Corcoran</u>
Brian H. Corcoran
Chief Special Master

---

[10] The parties agree that this sum is reimbursable. Joint Status Report, filed Dec. 15, 2025 (ECF No. 39).

[11] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.